**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

**LADEENA K. MONTGOMERY,**

                    **Plaintiff,**

**v.**                                                    **Case 1:20-cv-01052-STA-cgc**

**KILOLO KIJAKAZI,
Acting Commissioner of Social Security,**

                    **Defendant.**

---

**REPORT AND RECOMMENDATION ON SECTION 405(g) REVIEW
OF THE COMMISSIONER'S FINAL DECISION
DENYING APPLICATION FOR DISABILITY INCOME BENEFITS AND
SUPPLEMENTAL SECURITY INCOME**

---

Plaintiff filed this action to obtain judicial review of Defendant Kilolo Kijakazi, Acting Commissioner of the Social Security Administration's, final decision denying her application for disability income benefits ("DIB") and supplemental security income ("SSI") sought pursuant to Title II and Title XVI of the Social Security Act ("the Act"), 42 U.S.C. Section 401, *et seq.* and Section 1381, *et seq.* (Docket Entry ("D.E.") # 1, #6, #10, #18).

Pursuant to Administrative Order 2013-05, this matter has been referred to the United States Magistrate Judge for Report and Recommendation. For the reasons set forth herein, it is RECOMMENDED that the decision of the Acting Commissioner be AFFIRMED.

## I.    Procedural History

On September 16, 2014, Plaintiff protectively filed applications for DIB and SSI benefits. (Tr. at 179).[1]  In both applications, Plaintiff alleged disability beginning on February 5, 2013  (Tr. at 179, 378, 404), but she later amended her alleged onset date to be September 16, 2014 (Tr. at 370).  These claims were denied initially on February 10, 2015 and upon reconsideration on September 4, 2015.  (Tr. at 179).  Thereafter, Plaintiff filed a written request for hearing on September 16, 2015.  (*Id*.)  On February 23, 2017, a hearing was held before an Administrative Law Judge ("ALJ").  (*Id*.)  On July 6, 2017, the ALJ determined that Plaintiff was not disabled under the Act (Tr. at 188); however, on February 28, 2018, upon review to the Appeals Council ("AC"), the ALJ's decision was vacated and the case was remanded to the ALJ for further review. (Tr. at 192-97).

On July 13, 2018, the ALJ held a hearing on the remanded case.  (Tr. at 17).  On August 15, 2018, the ALJ again determined that Plaintiff was not disabled under the Act.  (Tr. at 17-31). The AC denied Plaintiff's request for review.  (Tr. at 7-11).   This decision became the Acting Commissioner's final decision.  Plaintiff then filed this action pursuant to 42 U.S.C. § 405(g) requesting that the Court reverse and remand for an award of benefits or, in the alternative, remand this case for further administrative proceedings.   (*See* D.E. #1 at PageID 2-3).

## II.    Commissioner's Determination of Disability

The Act defines disability as the inability to engage in substantial gainful activity.  42 U.S.C. § 423(d)(1).  The claimant bears the ultimate burden of establishing an entitlement to

---

[1]    The transcript of the administrative proceedings has been filed by the Acting Commissioner as attachments to the Answer, (*see* D.E. #28), and will be cited as (Tr. at [page number]).

benefits. *Born v. Secretary of Health & Human Services*, 923 F.2d 1168, 1174 (6th Cir.1990). The initial burden of going forward is on the claimant to show that she is disabled from engaging in her former employment; the burden of going forward then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. *Id.*

The Commissioner conducts the following, five-step analysis to determine if an individual is disabled within the meaning of the Act:

> 1. An individual who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2. An individual who does not have a severe impairment will not be found to be disabled.
>
> 3. A finding of disability will be made without consideration of vocational factors if an individual is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the regulations.
>
> 4. An individual who can perform work that he has done in the past will not be found to be disabled.
>
> 5. If an individual cannot perform his or her past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301 (6th Cir. 1988).

Before proceeding to Step Four of the sequential analysis, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4), 404.1545, 416.920(a)(4), 416.945. The RFC is a determination of the most an individual can still do despite the physical and/or mental limitations that she experiences in a work setting due to her impairment(s) and any symptoms resulting therefrom. 20 C.F.R. §§ 404.1545(a)(1),

416.945(a)(1).  Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis.  20 C.F.R. §§ 404.1520, 416.920.

Here, the ALJ determined as follows: (1) Plaintiff met the insured status requirements of the Act through June 30, 2015; (2) Plaintiff has not engaged in substantial gainful activity since September 16, 2014, which is the alleged onset date; (3) Plaintiff has the following severe impairments: narcolepsy, obesity, and a "severe combination of mental impairments (depression and accompanying anxiety)"; (4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Plaintiff's RFC permits her to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b) with the following limitations: (a) Plaintiff may perform "frequent bilateral handling"; (b) Plaintiff may not climb ladders, ropes or scaffolds; (c) Plaintiff may occasionally perform "other postural activities" such as "climbing ramps/stairs, stooping, balancing, crouching, kneeling, and crawling"; (d) Plaintiff may not be exposed to hazards such as "unprotected heights and dangerous moving machinery"; and, (e) Plaintiff's mental functional ability allows her to perform "simple and detailed, routine, repetitive tasks and infrequent/occasional routine changes in work duties"; (6) Plaintiff has no past relevant work; (7) Plaintiff was born on December 23, 1976 and is forty-one years old as of the date of the decision, which is defined under the Act as a younger individual between ages eighteen and forty-nine; (8) Plaintiff has at least a high school education and is able to communicate in English; (9) transferability of job skills is not an issue because the claimant does not have past relevant work; and, (10) considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (Tr. at 20-30).

4

### III.    Standard of Judicial Review

Pursuant to 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to which she was a party.  "The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  *Id.*  The court's review is limited to determining whether or not there is substantial evidence to support the Commissioner's decision, 42 U.S.C. § 405(g);  *Wyatt v. Secretary of Health & Human Services*, 974 F.2d 680, 683 (6th Cir.1992); *Cohen v. Secretary of Health & Human Srvs.*, 964 F.2d 524, 528 (6th Cir.1992), and whether the correct legal standards were applied, *Landsaw v. Secretary of Health & Human Servs.,* 803 F.2d 211, 213 (6th Cir.1986).

The Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations and resolve material conflicts in the testimony, and to decide the case accordingly.  *See Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984).   When substantial evidence supports the Commissioner's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

### IV.    Issues Presented

#### A. Whether the ALJ erred in Step Two by finding that Plaintiff's carpal tunnel syndrome was not a severe impairment

First, Plaintiff argues that the ALJ's Step Two determination that her carpal tunnel syndrome does not constitute a severe impairment is not based upon substantial evidence.  (Pl.'s Brief at PageID 2689-90).  Specifically, she argues that the ALJ erroneously relied upon statements

made by Plaintiff's mother, Kathleen Woodruff ("Woodruff"), which she states do not relate to

her carpal tunnel syndrome but instead address how well Plaintiff's right hand had been healing

after a fracture that occurred from a fall off of her porch and a series of surgeries to treat it. (*Id.*)

The Acting Commissioner argues that, "[e]ven if Plaintiff's allegation is accurate," the ALJ's

analysis was supported by substantial evidence.

In her Step Two analysis, the ALJ determined that Plaintiff's carpal tunnel syndrome was

not a severe impairment for the following reasons:

> Richard Murphy, M.D., has been the claimant's primary care physician since
> September 27, 2012. He reported that date that she was "fired" by her last doctor
> when the doctor learned "she was trying to get disability." Dr. Murphy's records
> in the file are updated through April 2018. It is very apparent that his notes are
> entered as duplicative templates that include repetitive entries unless noteworthy
> changes in status occurred. He used at least 2 such templates, the most recent of
> which specifies that the patient "Denied" abnormalities with regard to the areas of
> exam consideration.
>
> Dr. Murphy referred her for EMG testing on October 24, 2014. The EMG indicated
> bilateral carpal tunnel syndrome, worse on the non-dominant left. Dr. Murphy
> referred her to an orthopedic specialist, Dr. Michael Smigielski, M.D., who
> examined her on November 20, 2014. Dr. Smigielski cited to a previous injury to
> her right wrist but did not indicate that there were any significant persisting
> symptoms or limitations in the dominant right wrist or arm. Rather, he clinically
> confirmed the diagnosis of carpal tunnel syndrome on the non-dominant left. Dr.
> Smigielski performed left carpal tunnel release surgery on December 4, 2014.
> There is no indication in the evidence that the claimant has ever returned to see Dr.
> Smigielski.
>
> Consistent with the format of his other records, Dr. Murphy's repetitive notes
> document the significant event of the left carpal tunnel surgery. His notes on
> December 23, 2014 and January 27, 2015, about 7 weeks out from surgery, describe
> the left wrist as "healing well" and the claimant as "feeling much better." As of
> February 26, 2015, less than 3 months out from the surgery, and thereafter through
> his most recent record in the file from April 24, 2018, there is no more mention of
> significant carpal tunnel symptoms. Rather, carpal tunnel symptoms such as
> weakness and numbness are absent or "Denied."
>
> The claimant's mother, Ms. Woodruff, completed an updated Function Report for
> her on October 4, 2017 stating that she continued to require bilateral wrist splints

6

because of carpal tunnel symptoms.  The claimant's testimony on July 13, 2018 was essentially that her allegations remain consistent with what was stated in the October 4, 2017 Function Report.  However, the objective medical evidence provides no suggestion of other than complete and prompt healing after the December 4, 2014 left carpal tunnel surgery.  After January 27, 2015, Dr. Murphy's treatment records provide no other suggestion of significant carpal tunnel symptoms.  In fact, they include notations that the claimant repeatedly "Denied" any weakness or numbness.  Accordingly, the updated evidence will not reasonably support finding that significant symptoms of or limitations from carpal tunnel syndrome persisted for 12 months from the September 16, 2014 alleged onset. Therefore, carpal tunnel syndrome is no longer a severe impairment.

(Tr. at 20-21) (citations omitted).

At the outset, Plaintiff does not argue that the ALJ's summarization of Dr. Murphy or Dr. Smigielski's records is inaccurate.  Instead, she only asserts that the ALJ misunderstood Woodruff's statements as being related to carpal tunnel syndrome, which Dr. Murphy and Dr. Smigielski's records reflect was in her left hand, when they were, in fact, related to a prior traumatic injury to her right hand.

A review of the Function Report, which was completed by Woodruff on Plaintiff's behalf,[2] does not mention carpal tunnel syndrome and does not make clear what precise illness, injury, or condition causes Plaintiff to have difficulties utilizing each of her hands; however, it does report the following limitations:

- When asked "How do your illnesses, injuries, or conditions limit your ability to work?," Woodruff responds on Plaintiff's behalf as follows: "Both my right hand and my left hand fall asleep leaving my hands numb and unable to feel anything. Certain movements like repetitive motion will trigger this numbness[.]  I have no clue when it will happen.  When it does[,] the numbness lasts for an hour or more. This happens 4 times a day or more.  I find it difficult to hold, grasp, [or] hang on

---

[2]  The Function Report is intended to be completed by the claimant and asks the individual to report "your" illnesses, injuries and conditions (Tr. at 459-466); however, Woodruff completed the Function Report for Plaintiff and, in doing so, had to repeat questions "over and over again as she would lose her concentration, train of thought or fall asleep," which are symptoms that the Function Report attributes to Plaintiff's narcolepsy.  (*Id.*)

to what is in my hands.  It[']s gotten worse but they (DRs) have done all they can
to help."  (Tr. at 459).

- When asked how her illnesses, injuries, or conditions affect her ability to dress,
  Woodruff reports that Plaintiff "can't button or unbutton" and that she has
  "problems zipping – hands go numb."  (Tr. at 460).

- When asked if she prepares her meals, Woodruff reports on Plaintiff's behalf that
  she fixes cereal and peanut butter sandwiches if her hands are not numb and she
  can hold a spoon.  (Tr. at 461).

- When asked if she can drive, Woodruff reports that Plaintiff's hands go numb and
  she cannot "feel them on the steering wheel."  (Tr. at 462).

- When asked if she uses any assistive devices, Woodruff reports that Plaintiff uses
  a "brace/splint for both wrists and hands" and that these were prescribed "@ 1998
  and after surgeries @ 2011."  (Tr. at 465).

- When asked when she needs to use the braces/splints, Woodruff reports as follows
  on Plaintiff's behalf: "I try to remember to wear them when wrists start to ache or
  go numb – on a daily basis.  I sometimes forget to wear them, though."  (Tr. at 465).

Woodruff also reports the following limitations, but it is not clear whether these are due to

her narcolepsy or the limitations in her wrists: (1) unable to "hold things"; (2) can shower only

with assistance; (3) cannot shave because it is "too dangerous"; and (4) requires assistance with

"inside chores, dishes, laundry, vacuuming[,] meals," mowing lawn, and taking out trash.  (Tr. at

460-61).  Also of note, Woodruff reports that Plaintiff cannot make jewelry, paint pictures, or sew

any longer because of narcolepsy, not because of any limitations to her hands or wrists.  (Tr. at

463).

It appears that the ALJ did incorrectly state that Plaintiff continued to require bilateral wrist

splints "because of carpal tunnel symptoms."  The Function Report never mentions carpal tunnel

syndrome.  Instead, it states that Plaintiff was prescribed braces / splints "@ 1998 and after

surgeries @ 2011."  The alleged onset date of the impairments raised in Plaintiff's claims for SSI

and DIB benefits is September 16, 2014. Thus, even if the ALJ had correctly stated that Plaintiff

has utilized braces / splits for symptoms that pre-dated her carpal tunnel syndrome, it would not

be relevant to Plaintiff's claims for benefits based upon impairments that began on or after

September 16, 2014.[3] [4]

Despite this one inaccurate statement contained in the ALJ's decision, the ALJ correctly

found that there is no medical documentation of Plaintiff complaining of carpal tunnel syndrome

or hand joint pain during her numerous visits with Dr. Murphy after it was surgically treated. (*See*

Tr. at 796-883, 1135-1212).[5] [6]  In fact, as already stated, Dr. Murphy's records only reflect that,

on two visits shortly after the surgery for carpal tunnel syndrome, Plaintiff stated that it was

"healing well" and that she was "feeling much better."  (Tr. at 647, 650).  Accordingly, it is

RECOMMENDED that the ALJ's determination that Plaintiff's carpal tunnel syndrome is not a

severe impairment is supported by substantial evidence.

---

[3] Dr. Murphy's records show that he initially began treating her on September 27, 2012, that she did not
complain of hand joint pain on that date or anytime from October 16, 2012 until October 23, 2014, (Tr. at
506-07, 509-10, 512-13, 515, 517-19 520-76).  It is worth noting that Dr. Murphy also recorded in
September 2012 that she had previously undergone surgery for a "broken arm."  (Tr. at 506).  Even so,
Plaintiff made no complaints, and Dr. Murphy did not observe any abnormalities, relating to her hand, wrist,
or arm until October 23, 2014.  (Tr. at 506).  Thus, Dr. Murphy recorded the onset date of Plaintiff's hand
joint pain as October 23, 2014.  (Tr. at 579).

[4] Additionally, while the Function Report states that Plaintiff has limitations that were not documented by
Dr. Murphy or Dr. Smigielski, Plaintiff has not raised any arguments about these inconsistencies. (*See* Pl.'s
Brief at PageID 2689-90).  Thus, they are not considered herein.

[5] Plaintiff's numerous post-operative visits with Dr. Murphy occurred between December 23, 2014 and
November 30, 2017 (Tr. at 646-658, 780-883, 1135-1212), and the Functional Report was completed on
October 4, 2017 (Tr. at 458-466).

[6] Plaintiff also briefly mentions that, on October 24, 2014, Dr. Remy A. Valdivia evaluated her and found
that there was evidence that she suffered from moderate carpal tunnel syndrome in her *right* wrist.  (Pl.'s
Reply Brief at Page ID 2718; Tr. at 789).  Although that is correct, there is no complaint at any time
thereafter, including in her numerous visits with Dr. Murphy that she was continuing to have any difficulties
consistent with carpal tunnel syndrome in her right wrist.  (Tr. at 641-658, 780-883, 1135-1212).

**B. Whether the ALJ properly considered Plaintiff's mental impairments in her Step Three analysis**

Next, Plaintiff argues that the ALJ's Step Three determination is not based upon substantial evidence because the ALJ did not properly consider Plaintiff's mental impairments.    Plaintiff argues that the ALJ selectively considered the notes from her therapist, Elizabeth Sellari ("Sellari").   Specifically, Plaintiff argues that the ALJ states that Sellari's notes from April 2, 2015 reflect that she had a global assessment of functioning rating ("GAF Rating") of fifty-five, which she asserts is within the "moderate" range; however, Plaintiff asserts that her GAF Rating was forty-five on intake, that it has never gone above fifty,[7] and that her "current" GAF Rating is 31.6.[8] Plaintiff argues that this error alone would require a finding that she is disabled under Paragraph B.

Upon review, the ALJ stated as follows in her Step Two findings that Plaintiff has a "severe combination of mental impairments (depression and anxiety)":

> The claimant is on a long-standing prescription for Xanax for control of depression and anxiety.  She has received psychological counseling since 2014 at a frequency of as seldom as one session over several months to sometimes 2 sessions a month from a master's degree counselor, Elizabeth Sellari, at Pathways Mental Health. These records mainly include reports of "situational" stress related to family

---

[7]  Plaintiff's Reply Brief contradicts this statement in her initial Brief by stating that, in March 2011, Plaintiff had a GAF score of 57.  (Pl.'s Reply Brief at PageID 2717.  Not only is that before the alleged onset date of the claims here, but Plaintiff provides no citation to this evidence, and it does not appear to be contained in the record before the ALJ and this Court.

[8] The Court has attempted to locate documentation of these lower GAF Ratings in the record without success; the only ratings that the Court located that appear to possibly relate to this scoring are a "Disability Score Description," which she has been rated at 50 consistently.  (Tr. at 763) (listing all Disability Score Descriptions).  However, it is not clear whether these are indeed the same, particularly as the April 2, 2015 record specifically lists a "GAF Score."  (*See* Tr. at 767).

interactions and life events, such as when her daughter married and moved away, her grandmother died and her disability claims were denied. Ms. Sellari's notes repeatedly show that the claimant handled such transient stressors relatively well in a context of general psychiatric stability. Repeated notions such as "coping well," overall in good spirits, "doing well" "euthymic mood," and "handling the stressors very well" are interspersed throughout Ms. Sellari's treatment records. More often than not, the claimant's general psychiatric status at the time of the exams is specifically described as "stable" . . . .

*The DSM-IV-TR* . . . explains that global assessment of functioning (GAF) ratings in the range of 61-70 indicate only "mild symptoms," 51-60 "moderate symptoms," and 50 and below at least "serious symptoms" of mental impairment that would typically preclude work. The only GAF rating in the Pathways records was on April 2, 2015. The GAF rating of 55 was squarely in the moderate symptom range, consistent with the general psychiatric stability described throughout the treatment history with Ms. Sellari. . . . With consistent moderate limitations, the updated evidence continues to support an ongoing severe combination of mental impairments.

(Tr. at 21).

The ALJ then continued to Step Three analyze whether the severity of Plaintiff's mental impairments, considered singly and in combination, meet or medically equaled Listings 12.04 and 12.06. (Tr. at 22). In making this finding, the ALJ considered whether the Paragraph B criteria were satisfied, which requires the mental impairments to result in at least one extreme or two marked limitations in a broad area of functioning.

In doing so, the ALJ began by reiterating certain findings already discussed above—namely that the GAF Rating of 55 was consistent with both the longitudinal records from Sellari that indicate "moderate symptoms" with "general mental functional stability despite situational stressors" and with the State agency psychological consults' findings that Plaintiff has "mild limitations in social functioning and moderate limitations in maintenance of concentration, persistence or pace." (*Id.*) Thus, the ALJ accorded these sources "great weight." (*Id.*) The ALJ

11

also found that Plaintiff has mild limitations in "understanding, remembering, or applying information," "interacting with others," and "adapting or managing oneself." (*Id*.)

Upon review, the evidence does reflect that Plaintiff was assessed a GAF Rating of 55 on April 2, 2015. (*See*. Tr. at 767). Although Plaintiff provides no citations to the record to support her assertions that, on other occasions, she was assessed GAF Ratings of 45 and 31.6, the Acting Commissioner does not appear to contest that the ALJ could have relied on "lower GAF score[s]." (*See* Memorandum in Support of Commissioner's Decision at PageID 2704).

Even so, the Social Security Administration has advised that the GAF Rating "does not have a direct correlation to the severity requirements in our mental disorders listings." *See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632. Further, Plaintiff bears the burden of proving that she meets a listing, *see Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001), and she has not articulated how the consideration of other GAF Ratings in the record would require such a conclusion. On the contrary, the ALJ has supported her decision with substantial evidence, including Sellari's longitudinal records and the State agency psychological consultants' findings, all of which she found to be consistent and provide support for mild to moderate limitations. Thus, it is RECOMMENDED that substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairments, considered singly or in combination, do not meet a listing under Step Three.

### C. Whether the ALJ properly considered the limitations imposed by Plaintiff's narcolepsy in determining her RFC

Next, Plaintiff argues that the ALJ did not properly consider the limitations imposed by her narcolepsy in determining her RFC. (Pl.'s Brief at 2691-93).[9] Specifically, she asserts that the ALJ erroneously rejected the opinions of her treating physician, her mother, and herself and focused too heavily on whether she experienced narcolepsy with or without cataplexy. (*Id*.) Plaintiff further argues that, to the extent that the ALJ relies upon records where she has visited her daughter in other states and enjoys crafting, Plaintiff argues that a disability cannot be penalized for attempting to maintain a degree of normalcy in her life. (*Id*.)

### i. Whether the ALJ properly considered the treating source opinions of Dr. Murphy in determining the limitations imposed by narcolepsy

Beginning with the ALJ's consideration of the opinions of Plaintiff's treating physician, Dr. Murphy, the ALJ was required to comply with 20 C.F.R. § 404.1527,[10] which governs the consideration of medical opinions. Generally, more weight will be given to the claimant's own "treating sources, since these sources are likely the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R.§ 404.1527(c)(2). If the ALJ concludes that a treating source's medical opinion is "well-

---

[9]  In her Reply Brief, Plaintiff additionally argues that the ALJ "failed to take into account the debilitating effects of narcolepsy when making her determination at step four." (D.E. #35 at PageID 2716). Step Four considers whether an individual can perform work that she has done in the past. Here, the ALJ determined that Plaintiff has no past relevant work. (Tr. at 29). Thus, the ALJ did not undergo any specific analysis under Step Four but, instead, continued to Step Five of the sequential analysis.

[10]  This rule applies to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.1527. Plaintiff's claims were filed on September 16, 2014.

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it will be given "controlling weight." *Id.*

If a treating source's opinion is not given controlling weight, the ALJ must consider the following in determining the weight to accord the opinion: (1) the length of the treatment relationship and the frequency of examination, 20 C.F.R. § 404.1527(c)(2)(i); (2) the nature and extent of the treatment relationship, 20 C.F.R. § 404.1527(c)(2)(ii); (3) the supportability of the opinion, 20 C.F.R. § 404.1527(c)(3); (4) the consistency of the opinion with the record as a whole, 20 C.F.R. § 404.1527(c)(4); (5) the specialization, 20 C.F.R. § 404.1527(c)(5); and, (6) any "other factors" that "tend to support or contradict the medical opinion," 20 C.F.R. § 404.1527(c)(6). Whether or not a treating source is given controlling weight, the ALJ must "always give good reasons in . . . [the] notice of determination or decision for the weight we give your treating source's medical opinion."  20 C.F.R. § 404.1527(c)(2).

Here, the record reflects that Dr. Murphy's treatment records were not only inconsistent with his own other written statements but, at times, were internally inconsistent.  (Tr. at 27-28).  One notable inconsistency between Dr. Murphy's treatment notes and later written statements was whether or not Plaintiff suffered from narcolepsy with cataplexy, which is a "condition in which there are abrupt attacks of muscular weakness and hypotonia triggered by an emotional stimulus such as mirth, anger, fear or surprise."  (Tr. at 25) (citation omitted).

The ALJ found that Dr. Murphy's treatment records through April 24, 2018 "invariably describe a diagnosis of narcolepsy **without cataplexy**."  (Tr. at 27)  The ALJ further summarized that the "clear context of the longitudinal treatment records from Dr. Murphy is that the claimant receives good medication control from her prescriptions without significant side effects, that she

14

has remained able to drive a car throughout the course of Dr. Murphey's treatment since 2012, that she has never experienced cataplexy or any other episodic paralysis or hallucinations, and that she has remained medically stable throughout." (*Id.*)[11]

In contrast to these findings from Dr. Murphy's treatment records, Dr. Murphy provided two written statements that reflect much more significant limitations. In the August 29, 2017 statement, Dr. Murphy provided a statement in support of the discharge of Plaintiff's student loans because she suffers from narcolepsy of "moderate severity that prevents her from sustaining work due to "intermittent and unpredictable sleep attacks 'at a second[']s notice' that could cause her 'to lose control of a machine or car.'" (Tr. at 28, 446). On July 9, 2018, Dr. Murphy wrote a letter stating that Plaintiff suffered from "severe narcolepsy" and "sudden cataplexy," resulting in "unpredictable, intermittent attacks" and "falling asleep at a second[']s notice." (Tr. at 28, 1258).

In addition to the inconsistencies regarding whether Plaintiff suffers from cataplexy, the ALJ extensively detailed inconsistencies within Dr. Murphy's treatment records, which she describes as being made on a "repetitive template format":

> Over the course of several notes, they simultaneously describe the claimant as "unable" to stay awake during the day, and then inconsistently describe in the same sentence and elsewhere in the same notes the prescribed medications in terms such as "controlling things nicely." All throughout the notes, symptoms such as neurological deficits, dizziness, fainting, headaches, joint pain, and sweating are indicated as "Denied" or otherwise not present. Any decline in health is also "Denied." The description of "unable" to stay awake during the day is dropped from the notes after a while, apparently once the inconsistency was discovered. The notes consistently describe her as "awake, alert, well developed and well nourished." Other repeated notations include that she was "having no problems or issues," and was "doing well," and was "fine." Aside from a short time of recovery

---

[11]  The ALJ also summarizes that medical evidence repeatedly and unequivocally details that she did not suffer from cataplexy from 2009, when she was diagnosed with narcolepsy, until 2012. (Tr. at 26). However, the ALJ notes that she only relies upon this evidence "to supply the necessary context with regard to the current allegations" and does not intent to "call into question the administrative finality" of the Commissioner's February 4, 2013 denial decision on a prior application for benefits.

from the carpal tunnel surgery during December 2014-February 2015, the most frequent untoward symptom noted is transient seasonal allergies.

(Tr. at 27).

Given these inconsistencies, the ALJ elected not to accord controlling weight to Dr. Murphy's opinions as a whole; however, she does accredit the "clear context of the longitudinal treatment records" from Dr. Murphy based upon his treatment relationship with Plaintiff. (Tr. at 27). She further explains that she accredits the treatment records over his later written statements because the "sustained benign nature of the longitudinal treatment records from Dr. Murphy make the medical opinions that Dr. Murphy has provided all the more questionable." (Tr. at 28). Additionally, she states as follows:

> Part of the hearing testimony, particularly from the claimant's mother, centered upon the difficulty that she and the claimant had getting medical opinions from Dr. Murphy in support of the disability claim. The allegations were that the unsatisfactory efforts of previously representing attorneys caused this difficulty. However, it appears more likely that the stark difference between the August 29, 2017 and July 9, 2018 statements from Dr. Murphy and the longitudinal records generated over the course of more than 5 years of treatment is the more likely source of difficulty in attaining such opinions.

(Tr. at 28). Accordingly, it is RECOMMENDED that the ALJ complied with 20 C.F.R. § 404.1527 in her evaluation of Dr. Murphy's treating source opinions and provided "good reasons" for the weight that she accorded to them.

### ii. Whether the ALJ erred in determining that Plaintiff and her mother's subjective allegations of the limitations imposed by her narcolepsy are not persuasive

Plaintiff conclusorily asserts that the ALJ erred by concluding that the subjective allegations provided by Plaintiff and her mother as to the extent of the limitations imposed by her narcolepsy are "not persuasive," are "often refuted by the objective medical evidence," and "are

inconsistent with the range of daily activities show in the evidence." (Tr. at 28). Plaintiff does not specify how she believes the ALJ improperly discredited their subjective allegations.

At the outset, the ALJ stated that she considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based upon the requirements of 20 C.F.R. § 404.1529, § 416.929, and Social Security Ruling 16-3p. The ALJ then summarizes the "numerous" written statements of allegations of symptoms and limitations from the claimant and her mother. (Tr. at 24-25).

The ALJ specifically discussed several of the inconsistencies between Plaintiff and her mother's reports and the medical evidence as reasons for finding their subjective allegations to be unpersuasive. First, the ALJ noted that Plaintiff's allegations themselves are highly inconsistent, as she reports that she is able to perform tasks requiring alertness, such as driving her grandmother to medical appointments, while at the same time alleging that she falls asleep unpredictably and suffers from cataplexy and hallucinogenic attacks. (Tr. at 27). Next, the ALJ compared the allegations of severe narcolepsy in the October 4, 2017 Function Report completed on Plaintiff's behalf by Woodruff with Dr. Murphy's treatment notes from September 28, 2017 and October 26, 2017. (Tr. at 27). In his records, Dr. Murphy notes that Plaintiff is "doing well" and "having no problems." (Tr. at 27). The ALJ also addressed that Plaintiff's mother reports that she suffers from cataplexy but discredited these reports because Dr. Murphy's longitudinal treatment records as well as the records from physicians dating back to 2009 consistently indicate otherwise. (Tr. at 24, 26).

The ALJ further considered the consistency of the reports that Plaintiff provided to her therapist with the medical treatment records. Specifically, Plaintiff advised her therapist that she was performing a significant variety of activities from at least May 2016 until May 2018:

"shopping, sometimes for hours at a time;" "doing routine household chores, such as washing dishes;" "walking without difficulty;" "attending to her grandmother's estate after she died," including managing the sale of her house and dispensing of her personal property; "making multiple out-of-state visits to see her daughter in Alabama and Kentucky;" and, "often working on crafts including making T-shirts, making jewelry and painting." (Tr. at 28). The ALJ found these allegations to be inconsistent with the much more significant limitations that Woodruff reported on Plaintiff's behalf in the October 4, 2017 Function Report. (Tr. at 28). The ALJ also noted that Plaintiff reported the very "particular symptom" of "hypnogogic episodes" on one sole occasion to her therapist but that that particular symptom is "very pointedly and specifically refuted by the medical records." (Tr. at 28).

Even after finding that the medical evidence largely discredits the extent of Plaintiff and her mother's alleged limitations due to narcolepsy, the ALJ explicitly expressed caution in crafting the RFC to ensure that Plaintiff could work safely even with the "remote possibility" of an episode. (Tr. at 29). Thus, the ALJ found that the "preclusion against exposure to hazards such as unprotected heights and dangerous moving machinery" and the limitation to frequent handling to avoid excessive exertion to be reasonably supported by the evidence. (Tr. at 29).

Ultimately, the ALJ concluded that the "claimant's medically determinable impairments could not reasonably be expected to cause all of the symptoms alleged, or the intensity, persistence and limiting effects of symptoms that are present" and that the "written and testimonial statements from the claimant and her mother are inconsistent with the medical evidence and the range of daily activities established by the record as a whole." (Tr. at 25). Based upon her detailed findings set forth above, and over no specific allegation of error by Plaintiff, it is RECOMMENDED that the

ALJ properly considered and weighed Plaintiff's subjective allegations, as well as those provided

by her mother on her behalf, in determining her RFC.

### D. Whether Plaintiff was afforded her right to be represented by an attorney or non-attorney during the administrative proceedings

In a section entitled "Past Attorneys," Plaintiff's Brief cursorily states that she "asked the

ALJ for an extension to seek legal help but was not granted any extra time." (Pl.'s Brief at PageID

2691). Plaintiff does not specify how or when Plaintiff alleges that she was denied any assistance.

Upon review, the record reflects that, in advance of the hearing before the ALJ, Plaintiff

was sent a letter indicating that she had the right to be represented by counsel or another person of

her choice and that there were agencies that would represent her free of charge if she qualified.

(Tr. at 62-63). Plaintiff was also advised that she did not have to have an attorney to "find

additional evidence, exam[ine] witness[es], and submit arguments in the matter." (Tr. at 63).

Plaintiff reviewed and signed the "waiver of right to representation form" and elected to proceed.

(Tr. at 62-64, 324). She also stated on the record that she understood that she has a right to the

assistance of an attorney or other qualified person, that she understood that the ALJ would

reschedule the hearing if Plaintiff wanted to obtain counsel, and that she wished to proceed without

assistance. (Tr. at 63).

Near the conclusion of the hearing, Plaintiff advised the ALJ that she was disappointed in

her prior two attorneys, who she blamed for not understanding narcolepsy, being "unhelpful," and

failing to "get the doctor to agree to write a letter." (Tr. at 77-78). During this discussion on the

record, the ALJ stated, "I will tell you that John Ketriside is one of the best attorneys that appears

in front of this office. The first attorney is not, but John Ketriside is an outstanding attorney." (Tr.

at 78).

Despite being advised of her right to counsel and explicitly waiving it orally and in writing,

Plaintiff asked the AC for an extension to file a civil action for, *inter alia*, the following reasons:

> I am also requesting more time so that I can find a lawyer. I had asked the judge
> during the hearing for an extension so that I could find a competent lawyer that
> knew more about my disorder. She told me that she thought the last lawyer that I
> had was just fine and then told me that she would make a decision based on the
> medical evidence in my file . . . .
>
> I thought it was also my right to seek legal assistance to help me with my case.
> Why was I denied the right to find a lawyer???

(Tr. at 5). In response to her request for an extension, the AC granted Plaintiff thirty additional

days to file a civil action. (Tr. at 1).

In light of the foregoing record showing that Plaintiff knowingly waived her right to the

assistance of an attorney or non-attorney and voluntarily proceeded with the administrative

hearing, it is RECOMMENDED that there is no evidence that Plaintiff has not been denied her

right to be represented by an attorney or non-attorney during the administrative proceedings in this

case. Further, while Plaintiff conclusorily states that the ALJ evidenced "bias" in remarking about

Mr. Ketriside's skill as an attorney, the Court finds that this was in no way related to the discussion

of Plaintiff's right to the assistance of an attorney or non-attorney or Plaintiff's decision to waive

it.

### E. *Whether the ALJ improperly relied upon only the medical evidence in the record*

Finally, Plaintiff argues that the ALJ did not base her decision upon the record as a whole

because, at one point during the administrative hearing, she stated that she was basing the decision "upon the medical that is in your record and not anything else . . . ." (Tr. at

80). Immediately before stating this, however, the ALJ stated that she was "going to look over

the file" and "everything that is in it." (Tr. at 80). Further, the ALJ's decision itself reflects that

the ALJ considered Plaintiff and her mother's reports in addition to the medical evidence as required by 20 C.F.R. §§ 404.1620(a)(3) and 416.920.  Accordingly, it is RECOMMENDED that the ALJ did not erroneously rely upon only the medical evidence in the record in her evaluation of whether Plaintiff was disabled.

### V.  Conclusion

For the reasons set forth herein, it is RECOMMENDED that the Decision of the Acting Commissioner be AFFIRMED.

**SIGNED** this 6th day of December, 2022.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.  28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**